AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Central District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the person by name and address)* )
) Case No. 8:22-MJ-00385
Black iPhone with serial number C7CZVD3XN72J )
)

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

   *See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

   *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attachment B | See Attachment B |

The application is based on these facts:

   *See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Ernesto Aguilar
*Applicant's signature*

Ernesto Aguilar, Special Agent (DEA)
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

*Judge's signature*

City and state: Santa Ana, CA    Honorable John D. Early, U.S. Magistrate Judge
*Printed name and title*

AUSA: Benjamin R. Barron (714-338-3536)

**A F F I D A V I T**

I, Ernesto Aguilar, being duly sworn, declare and state as follows:

## I. INTRODUCTION

2. I am an investigative and law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516. I am currently a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), Los Angeles Field Division, and have been employed in this capacity since December 2019.

3. During the course of my employment with DEA, I have received several hundred hours of comprehensive, formal instruction on such topics as drug identification, patterns of drug trafficking, the exploitation of drug traffickers' telecommunications devices, criminal law, surveillance, and other investigative techniques. I have initiated and assisted in investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of controlled substances, the laundering of drug proceeds, and conspiracies associated with drug offenses. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including but not limited to, surveillance, management of confidential sources, search warrants, and telephone toll analysis.

4. I have participated in investigations concerning the identification of co-conspirators through the use of telephone records, financial records, photographs, and other documents. I have

assisted in the handling of confidential sources to gather intelligence through various methods to include consensual recordings. I have conducted physical surveillance in connection with drug trafficking investigations. I have also conducted investigations in which Global Positioning System ("GPS") information has been used to locate and track persons who are the subjects of criminal investigations.

5.  Based upon my experience and training with the DEA as well as conversations that I have had with other, more experienced agents and law enforcement officers who specialize in drug trafficking investigations, I am familiar with the methods utilized in drug trafficking operations and the trafficking patterns employed by drug trafficking organizations. I have also spoken with agents, as well as other law enforcement officers, about their experiences and the results of their investigations and interviews. Through my conversations with these agents and other law enforcement officers, I am knowledgeable in the methods and modes of drug trafficking.

## II.   PURPOSE OF AFFIDAVIT

6.  This affidavit is made in support of an application for a warrant to search the following cellular telephone (the "SUBJECT TELEPHONE") for evidence described in Attachment B, which are the fruits, instrumentalities, and evidence of violations of Title 21, United States Code, Section 841(a)(1) (distribution of a controlled substance and possession with intent to distribute a controlled substance, including distribution resulting in death) ("the Subject Offenses"): a black iPhone, serial number C7CZVD3XN72J, in the secured custody of the DEA office located at 1900 East First Street in Santa Ana, California, which is believed to be used by Michael

John O'KEEFE, although it is subscribed in a third party's name, as described further in Attachment A. Attachments A and B are incorporated as though fully set forth herein.

7. The facts set forth in this affidavit are based upon my personal observations, my direct participation in this investigation, discussions with other law enforcement personnel involved in this investigation (including from the Huntington Beach Police Department), my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. STATEMENT OF PROBABLE CAUSE

#### A. Summary of Probable Cause

8. I am investigating the narcotics overdose death of 26-year-old victim Zachary Duncan ("Z. Duncan"), on or about July 3, 2020. Based on evidence set forth herein, I submit that there is probable cause to believe that (1) Michael John O'KEEFE ("O'KEEFE") is a drug trafficker who supplied fentanyl to Z. Duncan hours before his death, and (2) Z. Duncan suffered a fatal overdose after using those drugs. Investigators have found text messages on Z. Duncan's phone from shortly prior to his death, during which Z. Duncan and O'KEEFE set up the fentanyl transaction that led to Z. Duncan's death. Soon thereafter, a Huntington Beach Police Department ("HBPD") detective arrested O'KEEFE for an outstanding warrant unrelated to Z. Duncan's

3

death. O'KEEFE admitted selling drugs to Z. Duncan, though he denied selling the drugs that caused Z. Duncan's overdose death. The HBPD detective seized the SUBJECT TELEPHONE during O'KEEFE's arrest and continues to maintain the telephone in secured storage.

**B.  Overdose Death of Zachary Duncan**

9.  On July 3, 2020, at approximately 7:00 a.m., Z. Duncan was found unresponsive in a bedroom at his apartment complex located at 17622 Cameron Lane, Apt 20, Huntington Beach, California by the Huntington Beach Fire Department. Department ("HBPD") officers Montero and Nikitin also arrived at the scene. Paramedic T. Hummel informed them that Duncan was determined to be deceased. The officers observed Duncan lying face down on his bed, and they saw a lighter and tin foil covered in black residue directly next to Z. Duncan. They saw no evidence of trauma or a crime of violence.

10. The officers met with Z. Duncan's father Danny Duncan ("D. Duncan"). During an interview, D. Duncan said that, on July 3, 2020, at approximately 7:00 a.m., D. Duncan called out Z. Duncan's name and heard no reply. D. Duncan stated Z. Duncan's door was locked. D. Duncan stated he thought this was suspicious due to the fact Z. Duncan would only lock the door if he were using drugs and did not want to be caught. D. Duncan stated he opened the door by twisting the lock with his finger and noticed his son was lying on the bed facedown. D. Duncan stated he went to turn his son over and noticed he was stiff to the touch and unresponsive. D. Duncan stated he turned Z. Duncan over in order to start CPR and noticed Z. Duncan had discoloration to his face. D. Duncan said that he then called 911. D. Duncan stated that underneath Z. Duncan's face was a piece of foil and stated there were narcotics next to

1  Z. Duncan's bed. Officer Montero asked D. Duncan what type of
2  drugs Z. Duncan used and D. Duncan stated that his son mostly used
3  heroin and fentanyl, but that he was known to use anything. D.
4  Duncan advised Officer Montero that, other than Z. Duncan's chronic
5  drug use, Z. Duncan was healthy and did not have any medical
6  conditions.

7  11. Officer Montero called the Orange County Coroner's office
8  to notify them of the death. At approximately 8:24 a.m., Coroner
9  Investigator Aaron Marshall arrived on scene and conducted his
10 investigation. Officer Marshall took possession of the body along
11 with the paraphernalia located in Z. Duncan's room. Officer
12 Marshall advised Officer Montero based on his preliminary
13 investigation and the condition of the Z. Duncan, that Z. Duncan
14 has likely been deceased since 3:00 a.m. on July 3, 2020. The
15 body of Z. Duncan was then transported to the Coroner's office for
16 further investigation. Officer Montero subsequently sent the drug
17 evidence to the Orange County Crime Lab for further analysis.

18 12. On September 4, 2020, the Orange County Crime Lab released
19 a toxicology examination report finding that the substance fentanyl
20 $0.0396 \pm 0.0043$ mg/L in Z. Duncan's postmortem blood, and finding
21 that acute fentanyl intoxication was the cause of his death.
22 Fentanyl is a Schedule II opioid/narcotic drug that is 50 times more
23 powerful than heroin.

24 **C. Search of Z. Duncan's Cellular Telephone**

25 13. On July 3, 2020, D. Duncan gave Huntington Beach Detective
26 Zachariah Pricer verbal and written consent to search Z. Duncan's
27 phone (the "Z. Duncan Phone"). That day, Detective Pricer reviewed
28 the Z. Duncan Phone. Detective Pricer observed a series of text

5

messages between Z. Duncan, using the Z. Duncan Phone, and a person believed to be Michael O'KEEFE ("O'KEEFE"), via the phone number 714-623-5077, i.e., the SUBJECT TELEPHONE.  I recognize that, in the text messages, Z. Duncan and O'KEEFE discuss a drug transaction on July 2, 2020, shortly before Z. Duncan died.

      a.   At 10:17 p.m., Z. Duncan sent a message to O'KEEFE: "Super overpriced but u put up with my stealth directions so it's really really appreciated that u came through regardless Man might be the last time I grab because I might be leaving state so it's been real good getting to know you mike".  At 11:03 p.m. and 11:04 p.m., O'KEEFE responded: "Sorry my dude" and "My guy got busted and fetty is up."

      b.   Based on my training and experience, I recognize that O'KEEFE and Z. Duncan were discussing a drug transaction that had occurred that night.  Specifically, Z. Duncan commented that the price of drugs purchased that night was higher than usual ("super overpriced") but that Z. Duncan appreciated O'KEEFE supplying the drugs ("really appreciated that u came through regardless").  O'KEEFE responded that it was because "my guy got busted," that is, that O'KEEFE's supplier had been arrested, as a result of which "fetty is up," that is, the price of the fentanyl ("fetty") sold to Z. Duncan had increased.  Moreover, the timestamp of the text messages show that they were sent approximately 8 hours before Z. Duncan was discovered deceased in his room from a fatal fentanyl overdose.

    **D.   Arrest and Interview of O'KEEFE**

   14.   On July 28, 2020, HBPD Detective Jesse Crawley arrested O'KEEFE on an outstanding warrant unrelated to Z. Duncan's overdose death, and for possession of a controlled substance based on

6

suspected fentanyl (verified by later testing) found while executing the arrest warrant. Subsequent lab analysis confirmed that the substance was fentanyl. O'KEEFE was in possession of the SUBJECT TELEPHONE, which was then booked following his arrest.

15. Later that evening, Detective Pricer interviewed O'KEEFE at Huntington Beach Jail, after O'KEEFE waived his Miranda rights. O'KEEFE made the following statements, among others. O'KEEFE confirmed that he knew Z. Duncan, but could not recall the last time he spoke with Z. Duncan. O'KEEFE said that the last time he texted Z. Duncan, Z. Duncan said he was going away in an attempt to get clean from drugs. Detective Pricer asked O'KEEFE if he sold or gave drugs to Z. Duncan on the evening of July 2, 2020. O'KEEFE denied that he provided Z. Duncan any drugs that night, though O'KEEFE admitted that he has previously sold drugs to Z. Duncan. Detective Pricer asked O'KEEFE the last time he sold drugs to Z. Duncan. O'KEEFE stated he did not remember the exact date, however believed it had been about a month and a half prior to the interview date. O'KEEFE said at that time, Z. Duncan sent him a text message stating he was going out of state to get clean from drugs. O'KEEFE stated he had not heard from Z. Duncan since that exchange.

16. On August 4, 2020, Detective Pricer responded to Theo Lacy Detention Center, where O'KEEFE was being held. Detective Pricer obtained O'KEEFE's cellphone (the SUBJECT TELEPHONE) from the detention center's property unit. O'KEEFE signed a receipt acknowledging that his cell phone was being removed from the property unit to Detective Pricer. Detective Pricer transported O'KEEFE's cellphone to the Huntington Beach Police Department, where it was booked into evidence.

17. HBPD officers later attempted to search the phone pursuant to a warrantless search term of O'KEEFE's probation at the time, stemming from a 2019 conviction for possessing a controlled substance for sale, in violation of California Health and Safety Code Section 11378.[1] A forensic report documenting the search shows that the officers were only able to extract limited information from the SUBJECT TELEPHONE. The forensic reports confirm, however, that the phone number for the SUBJECT TELEPHONE was in fact 714-623-5077; *i.e.*, the same phone number used to communicate with Z. Duncan. The SUBJECT TELEPHONE was later turned over to DEA to be held at its Santa Ana office. I understand that DEA expects to be able to extract additional information from the SUBJECT TELEPHONE pursuant to the warrant requested herein.

### V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

18. As used herein, the term "digital device" includes the SUBJECT TELEPHONE.

19. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file

---

[1] The condition reads as follows: "Submit your person and property including any residence, premises, container, or vehicle under your control, including electronic devices, to search and seizure at any time of the day or night by any law enforcement officer, probation officer, or mandatory supervision officer with or without a warrant, probable cause or reasonable suspicion."

8

does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously

followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

20.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

  a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

  b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

21.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

## VI. CONCLUSION

22. Based upon the facts described above and in Exhibit 1 (which is incorporated in this Affidavit as thought set forth in its entirety herein), there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses, will be found on the SUBJECT TELEPHONE, as described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this \_\_\_\_ day of May 2022.

_____
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

PREMISES TO BE SEARCHED

The premises located at an Apple iPhone (the "SUBJECT TELEPHONE"), serial number C7CZVD3XN72J, maintained in secure custody at the Drug Enforcement Administration offices located at 1900 East First Street in Santa Ana, California.

**ATTACHMENT B**

ITEMS TO BE SEIZED

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) (distribution of a controlled substance and possession with intent to distribute a controlled substance, including distribution resulting in death), namely:

    a.  Data, records, documents, programs, applications, photographs, recordings, or other materials relating to the possession, acquisition, or trafficking of controlled substances, such as: ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, or other records noting price, quantities, and/or times when controlled substances were bought, sold, or otherwise distributed.

    b.  Data, records, documents, programs, applications or materials relating to: (1) Z. Duncan, such as communications with or about him; or (2) any drug overdose or drug overdose death.

    c.  Data, records, documents, programs, applications, photographs, recordings, or other materials relating to the collection, transfer or laundering of the proceeds of controlled drug trafficking.

    d.  Global Positioning System ("GPS") coordinates, calendar entries, or other locational information or records documenting location, travel routes, destinations, or origination points.

    e.  Any data, records, documents, programs, applications, photographs, recordings, or other materials that otherwise relate to the dates July 2, 3, and/or 4, 2020, such as: calendar entries,

communications and communication logs on such dates or relating to events that occurred on such dates, or recordings created on such dates or relating to events that occurred on such dates.

   f. If the SUBJECT TELEPHONE contains evidence falling within the scope of the foregoing categories of items to be seized:

     i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

     ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

     iii. evidence of the attachment of other devices;

     iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

     v. evidence of the times the device was used;

     vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

     vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

     viii. records of or information about Internet Protocol addresses used by the device;

     ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

  2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

**I.** **SEARCH PROCEDURE FOR THE SUBJECT TELEPHONE**

  3. In searching the SUBJECT TELEPHONE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

    a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT TELEPHONE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

    b. The search team will, in its discretion, either search each SUBJECT TELEPHONE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

    c. The search team shall complete the search of the SUBJECT TELEPHONE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant. The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

         d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

               i.    The search team may subject all of the data contained in each SUBJECT TELEPHONE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT TELEPHONE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

              ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

              iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

         e.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

         f.    If the search determines that a SUBJECT TELEPHONE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT TELEPHONE and delete or destroy all forensic copies thereof.

         g.    If the search determines that a SUBJECT TELEPHONE does contain data falling within the list of items to be seized, the

government may make and retain copies of such data, and may access such data at any time.

   h. If the search determines that the SUBJECT TELEPHONE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

   i. The government may also retain a SUBJECT TELEPHONE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

   j. After the completion of the search of the SUBJECT TELEPHONE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

  4. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.